We have five cases for argument today and Madam Clerk, I ask you to please call the first case for argument. Yes, Your Honor. Case number 18-3689 Roderick Ford et al. versus TD Ameritrade Holding et al. All right, Mr. Hockman, we'll hear from you first. Good afternoon, Your Honors, and may it please the court. I'm going to focus my time today on the predominance issues, especially economic loss, but also reliance. But I'm, of course, happy to answer any questions on any issues. Let me turn to economic loss. Until the district court here, no court had certified a class to pursue securities fraud claims based on alleged failures to seek execution of orders. And there is no reason for this court to split with the Third Circuit's ruling in Newton. There, individualized issues of economic loss predominated because, and now I'm quoting, determining which class members were economically harmed required an individual analysis into each trade and its alternatives. The most striking thing about this case, plaintiffs somehow believes that conducting an individual analysis into each trade and its alternatives somehow distinguishes Newton, even though that is the precise reason the Third Circuit said a case like this cannot be a class action. Plaintiff, of course, claims the difference is that his expert, Mr. Bodek, can program a computer to do the individualized analysis. But hiding individualized litigation inside a computer doesn't make individualized litigation representative, and class litigation has to be representative litigation. By which I mean, a trial of the named plaintiff's claim determines liability for the named plaintiff and the class as a whole, and plaintiff's method simply doesn't treat evidence concerning economic loss for the named plaintiff as representative of economic loss to the class as a whole, or any other individual class member. And this is clear for three reasons that I'll discuss today, any one of... Overwhelming. First, Mr. Bodek admits he's doing individualized order-by-order analysis. He embraces the fact that his result, with respect to one order, doesn't answer the question for any other. The named plaintiff's orders can't be used even to develop an algorithm that they want to apply to the whole class. Mr. Bodek demands to see all the information covering all the orders of the whole class, even to figure out how to program a computer to figure out, on an individualized basis, mind you, whether economic loss occurred. And then third, it is clear that the plaintiff's attempt to try this case by algorithm doesn't avoid the cost. We already have dozens and dozens of pages of expert reports with disputes back and forth, about just 17 of the named plaintiff's orders. The details of those orders had to be examined, and that process is just going to be magnified enormously if this case proceeds as a class. So let me... He's not saying that when he determines economic loss for some of Mr. Ford's orders, that he'll use that result to determine economic loss even for the rest of Mr. Ford's orders. Each order stands alone. Bodek's algorithm analyzes the individual circumstances of one order, spits out Mr. Bodek's answer for that order, then turns to the next order and starts from scratch. This is a fundamental break with how class actions are designed to and must work. In a class action, if the named plaintiff fails to prove liability as to him, we know that absent class members couldn't prove liability either. That's why it's fair to bind absent class members to a named plaintiff's defeat on the merits. But not so here. Once Bodek's algorithm has analyzed whether the named plaintiff has suffered economic loss, we don't know whether other class members suffered economic loss. It has to treat each order on its own terms in light of all the varied and vast, unique market circumstances that apply. And that makes this case the same as this court's decision to reverse the class certification ruling earlier this year in Harris. Just as that case required the court to consider, quote, the unique circumstances of each job position to determine whether there was unlawful discrimination, here, Bodek is saying that he needs to consider the unique circumstances of each order to determine whether there was economic loss, and hence securities fraud liability. Now that basis alone is enough to reverse the class certification order, but there's more. The second point is that Mr. Bodek can't even use the named plaintiff's orders to build the algorithm that will then individually analyze each order. What Bodek is proposing to do comes down to this. He starts by looking at the orders submitted to TD Ameritrade, and he simply asks whether those orders either didn't execute or received something worse than the NBBO price. Initially, that's all he did. But then our expert, Dr. Clyden, pointed to a variety of circumstances in which the NBBO price might not have been available for that particular order at that particular moment, so no economic loss. And Bodek agreed. So Bodek went back to the drawing board, and he built in a variety of what he calls exceptions that acknowledge that even if a particular TDA order didn't get the NBBO price, there still was no economic loss. Clyden then goes back in and does some more digging, finds more exceptions, and back and forth we go. And so you see the exceptions are the heart of the matter. And it's critical to understand at this stage in the proceeding, not who's right or wrong about the exceptions, but that the exceptions don't emerge from common proof. They emerge only after examining the individualized market circumstances of very specific orders and very specific market circumstances. That's the only way to do it. And take a look at appendix page 166, where Bodek says his list of exemptions is not exhaustive, and he expects to add to them as more information comes in. He needs to see all the orders, all the market data from all absent class members just to develop his algorithm. So that puts this an extra level at which this case presents predominant individualized issues. Not only is the algorithm going to look at each order individually such that the outcome with respect to the name plaintiff's orders doesn't determine the outcome with respect to anyone else, but the algorithm that is going to spit out individualized answers can't even be built from common proof. Building the algorithm requires individual analysis of all orders. And then finally, the third reason is the fact that Mr. Bodek's individualized method for determining economic loss, that's hotly contested. The expert's disagreements will ultimately have to be decided by the fact finder at trial. There's no prospect of settling on an agreed method. Indeed, plaintiff's other expert, Mr. Corwin, admits there's no authoritative source, there's no regulation, there's no place you can go to get an exhaustive list, a comprehensive list of these critical exceptions that have to be built into the algorithm. That's at page 834 of the appendix. And we know that Bodek and Clyde don't agree. I referred earlier to the pages and pages of dispute over just 17 orders that's just going to grow and continue back and forth endlessly. And the fact this is really important at this stage of the proceeding, the fact that the experts are debating what the individualized circumstances of each class member's orders reveal for economic loss to determine how to program a computer doesn't change the fact of what they're debating, which is that the individual circumstances of class members' orders and what they reveal about economic loss. The fact that that individualized debate is unavoidable is yet another reason to deny class certification here and to reverse the class certification order. I hasten to add, we detail in our brief a list of a variety of disputes, customer trading strategies, unusual market conditions, etc. I'm not going to dwell on that here unless you have questions. But what I want to point out about that that's very important at this stage is that we think we're right, but what matters is somebody is going to have to decide who's right between Clyde and Bodek on this. That's ultimately going to have to be the fact finder in at least some, if not all, instances. And so this is not only a predominance problem, but it's an ascertainability problem, too. Because the answers to this dispute, this factual dispute between Boden and Clyde, is going to determine who's in and who's not in the class. And the class can't be known until these factual disputes are resolved. And that makes this case precisely like the recent case of this court in Orduno. In that case, of course, you had access to personal information that either had a permissible purpose or not. And what the plaintiffs did there is they took that unavoidably individualized issue and they just smuggled it into the class definition. And said, well, then we'll just define the class as people whose personal information was searched only for an impermissible purpose. Well, that's exactly what happened here. The court in that case said, well, that's an ascertainability problem because it's a fail-safe class. And rid of the individualized issue, you're just rolling it into the class definition. Same thing happened here, right? You have a class that's defined in terms of people who supposedly didn't receive best execution of their orders. And who were economically, and who suffered economic loss as a result. So that is yet another reason to deny class certification. Mr. Huckman, is it at least theoretically possible that an algorithm could account for all aspects of these riveted possibilities, and therefore could account for economic injury? I think it's theoretically possible that you could, at the end of the day, come out with one. But the process to get there is necessarily individualized. You can't avoid it. And that's what makes it a class certification problem. I'm not saying you can't build an algorithm. I'm not saying a fact finder can't decide who's right and who's wrong. I'm not even saying that there's no class case that could ever have an algorithm. But what I am saying is that this class case, under the current regulatory standards for what counts as best execution, under the current law regarding economic loss, where you have to go in and you have to see, was a better price available at some other market center at some other time? Under those circumstances, there's no way to do it, even if it theoretically can be done, there's no way to do it with common proof. And that's the legal standard. You need common proof. Otherwise, you don't have a common question, you have individualized questions. Counsel, so are you saying that in this situation, even if Bodek was given additional time to come up with a suitable algorithm, that's simply not possible in this case? I'm not saying it's not possible. Again, this, I think, is the same question. I'm not saying it's not possible to come up with an algorithm. But what I'm saying is what he's going to do is dig into all of the absent class members' orders. He's going to do an individualized analysis. He's doing it in order to program a computer. Doesn't make the rule that's being used to try to decide this case common, based on common evidence. It makes it, it reveals that it is in fact based on individualized evidence. He's got to go in, dig into the details, roll up his sleeves, look at all of the market circumstances, not just the circumstances of the order, but what was out there in the marketplace, and make a decision. Well, if you're not saying that it's impossible to have a class action that proceeds by algorithm, what's an example of an algorithm situation that would be common proof? Well, I think, as I said, I think under circumstances that are currently prevailing in the regulatory situation here, I don't know if you could do it under current law. I'm imagining... I don't know what you mean by circumstances that are currently prevailing in the regulatory situation, but that's why I thought if you gave an example it might help. Yeah, so, yeah, let me try. So, imagine a regulatory system that said, there's one thing you need to look at for best execution. Did you get the best price available at that particular moment? And did you try to get the best price available at that particular moment? If that's the only thing you had to look at, it might be possible to look to program, to look at the mechanisms for trading and say, okay, well, you either got it or you didn't get it. You'd have to really simplify things, and you'd have to really imagine situations where the movement of trades was being judged against a very single uniform benchmark, which everyone agreed on, and which you could use an individual order, an individual set of orders as a baseline against which to judge the outcomes. It's kind of hard to imagine in these kinds of situations, again, because our marketplace is so diverse. There's so many different market centers. You'd have to really simplify things down beyond which, beyond the... That's what I mean, just caught in by present circumstances, where you have a multi-factor test for best execution. You have a variety of different market centers. You have a whole host of different brokers, all of whom are competing for the best price at the same moment in time. How are you going to evaluate that? I think it's just very difficult under these circumstances. But there are other cases, other kinds of cases. I'm not sure best execution cases would be good examples where you could imagine it, I think. Going back to the Arduino case, you referred to that as what you called an ascertainability case. I don't think we use that term in there. Do you think our court has ever said that that ascertainability is a separate requirement for a class, since it's not a Term 23? Well, I think you referred to it as an ascertainability... I think it did refer to ascertainability. What it said was it is a problem of... It said primarily it's a problem related to predominance. But then it said it's beyond that. Just before it goes into the fail-safe discussion, I believe it refers to ascertainability. And it says you're not going to know who's in the class until you're done with the factual determination. And I think fail-safe is just a kind of ascertainability issue in any event. And there's clear and thorough discussion of fail-safe in that decision as well. And that's what I'm referring to, Your Honor. I thought there was some disagreement among the courts about whether ascertainability is really a criteria under Rule 33. I didn't think our court had ever adopted it, perhaps, because it's not in the rule. Yeah, it's not. There are separate problems with fail-safe classes that we talked about in Arduino. That's right, Your Honor. And it is certainly the case that some courts are more rigorous about ascertainability. Other courts say it's just not a requirement at all. I know the Ninth Circuit, for instance, has specifically said it's not a requirement. I'll go back during Mr. Poore's presentation and look at the relevant section of Arduino that I'm recalling. But I see that I'm moving into my rebuttal time. I haven't had a chance to address reliance. I would just say, leave the court with this. I said at the beginning that in order to affirm here on economic laws, the court would have to conflict with the Third Circuit. With respect to reliance, it is abundantly clear that in order to affirm the district court here, the court would have to split with the Second Circuit's decision in the Schwab case. The plaintiff admits that. The plaintiff simply tells this court that Schwab is wrong, doesn't offer a distinction. We think for all the reasons we've explained in the briefing, it's quite clear that Schwab is not incorrect. It's the right way to approach reliance issues in a case like this where there are numerous assertions of positive statements of best execution obligations. The plaintiff called it a misrepresentation case at 628 of the appendix. Pages 46 to 50 of the appendix talk about statements from TDA regarding its best execution obligations and client agreement, website, 10Ks, earning calls, and other public statements. The plaintiff's expert even referred to this as a misrepresentations case at page 93 of the appendix. With that, unless you have any further questions, I'll reserve the remainder of my time. What's your position in a nutshell on reliance? That it shouldn't be presumed here, and then it's admitted. If reliance is not presumed, it's admitted that you have to vacate and there's no class here. You have to reverse the class certification order. That's undisputed. Because it requires individual inquiries into whether each person relied? Correct. Yeah. Okay. I understand. Thank you. Thank you. Mr. Port, we'll hear from you. Thank you very much, Your Honor. Maybe if I just very quickly address the last point first, and then we're getting into economic harm if that's acceptable to the court. Counsel for appellants here argue that we would have to split from the Second Circuit to find the reliance here. Well, to adopt his position requires splitting both with this court's own decision in Lewis and in Zola with the Supreme Court decision in Affiliated Ood and the Third Circuit decision in Newton. So, you'd be choosing a unreported decision with no precedential value from the Second Circuit over the reported decisions and of considerable standing from the Supreme Court, the Third Circuit, as well as the recent decisions at this court. So, it's clear here that the presumption was properly applied. The facts here, as we explained in our briefing, are very similar to the facts in Affiliated Ood. This reliance issue applies in the circumstances where you have a pre-existing duty to disclose information, and that's undisputed here, and where the case really was all primarily about the failure to disclose material information, and here it was the failure to disclose. The practice of tedium eritreae to not seek best execution, but to seek greatest profits for itself, and that is undisputed. That was not disclosed to any class member, representative plaintiff, or any other class member. So, under those circumstances… Wasn't this case pled as a misrepresentation case? With respect, no, it's not, Your Honor. It's pled as a stealing liability case. In paragraph 116 of the complaint, it's quite clear that defendants engage in a planned scheme conspiracy in course of conduct, to which they engage in acts, transactions, practices, and courses of business, which operate as a fraud and deceit. So, I mean, it's a violation of rule 10b-5, A, B, and C. So, omissions were made, but it's primarily a scheme liability case. It's always been pleaded that way. And that is that the case is that the fact that the scheme involves some element, some representations made is inevitable. There is no such thing as a pure omission case. I think it's impossible to have a transaction in securities markets, which is required to have a 10b-5 case, without some form of communication between the parties. There were, as we outlined in our brief, very clear, affiliated, involved many, many representations far more directly involving the transactions at issue in affiliated OOP, and yet reliance was presumed. The case of, in Newton, where affiliated OOP reliance was found, there was an existing relationship of broker-dealer between the defendants and the plaintiffs, and reliance was found there. There were representations, and order was placed and accepted in Newton. That involves a representation made. So, although there was talk about an implied representation that they would execute a market order in accordance with the duty of best execution, that exact same implied misrepresentation is made here. So, we would submit on the question of reliance, these facts are the same as Newton, are the same as affiliated OOP, and so therefore we would hold that reliance is absolutely required here, as well for the policy reasons that affiliated OOP outlines, which is that proving reliance individually here is an almost practical impossibility. You have to show that you would have acted differently if you had known that information you didn't know about TD Ameritrade's routing practices. I don't know how you can do that short of just a conclusory statement. So if I could, I mean, the bottom line is, if TD Ameritrade here had never mentioned the word best execution in statements to the public and to its customers, there would still be a claim here. Because the claim here stems from their failure to disclose that they weren't meeting their duty of best execution, which exists regardless of whether they say they have a duty of best execution or not. The duty of best execution arises from the relationship between customer and broker. So that is what makes this very different from a typical 10B5 drop case, where the harm is caused by misrepresentation or omission into the market, which is then later revealed. If I may move on to, unless you all have further questions on reliance, I'll move to economic harm. What's your best authority that this best execution duty arises just from the relationship and not from a representation? I think Newton holds that. I think that's admitted in the answer of defendants in this case. I don't think it's subject to dispute. Okay. We'll check. But it's certainly in Newton. I can give you the page site if you want to, or bear with me. I apologize, I don't have it in me, but yes, it's in Newton, the site in my brief, I believe. On the question of economic harm, first of all, this is a factual question as to whether the methodology meets, can measure the economic harm effectively for this class. A panelist did not mention the standard of review, but this is an abuse of discretion review of the district court's decision, and the district court in this case accepted the testimony of two conceded experts in financial markets and in financial analysis, whose testimony has been relied upon and used by courts, the Southern District of New York, by Congress, by the Securities and Exchange Commission, by the Department of Justice. Appellants do not make any effort to attack their qualifications or argue that these are not well-founded opinions, and so submit this as a preliminary matter that is not an abuse of discretion for district court to accept the opinions of highly qualified experts within the areas of their expertise. Now, appellants would prefer, as a battle of experts, prefer that the court accept their expert over the other experts, over plaintiff's experts, but that's not an abuse of discretion. That is what courts do. The second thing that defendants have done here, the appellants, has mischaracterized or overcomplicated the nature of the analysis that is under done here by a computer algorithm. Yes, it is a lot of data points, but the analysis of whether the routing algorithm that TD Ameritrade adopts meets the standard of best execution is actually very similar to the example that counsel conceded would be adequate, particularly in the context of what are called trade-throughs, which are prices inferior to the national best bidder offer, or MBBO. It is a general rule that a price, a trade-through, an execution at a price inferior to the MBBO is per se an indication of a failure of best execution. That is the metric that Mr. Bodek identified, he called it IFQ. It's the same metric that TD itself has to use to measure the effectiveness of its best execution. It's the same measure that is reported to the SEC in their report 605. It's the same method that FINRA uses to measure best execution. It's the same measure that academics routinely use to measure best execution. If that IFQ number is negative, which is an algorithmic calculation based on the price executed versus the price available in the market at the time, which is an objective fact, it doesn't require any judgment, then that's indication of failure of best execution. It's as simple as that. The further... I thought the concern here was that you have to look at each trade individually to see whether it fails to meet the standard, and then you have to incorporate certain exceptions to the general rule to address whether those are individualized issues that... To the extent that they are not distinct, we would submit, than individualized issues in the calculation of damages, which are present in every single securities class action case, which does not prohibit class certification. In every classic stock drop class action, you have individual inquiries for damages of how each individual trade in that case, what date the stock was bought at, the level of inflation and the price at that particular point in time, when it was sold by that investor. None of that, all that just goes to the calculation of damages, none of that precludes certification of a class. And IFQ here is almost identical. It's highly analogous, which is it measures whether there was a trade through the MBBO at that particular point in time, and if it was, then that's prima facie evidence of failure of best execution. And the suggestion that this is super complicated and discretionary, these orders, TD Ameritrade has to consider every single one of these factors when it routes an order, and it routes them in less than a second, about 10 milliseconds is all it takes to route an order, taking into account all the factors that defendants identified in their briefing. So to suggest that the effect of those exceptions or factors can't be measured by another algorithm operating just as quickly and just as easily is denying the existence of modern technology. The other difference with Newton, so Newton involved orders that were manually routed, so that did involve a broker getting on the phone and calling different market centers and trying to figure out what the best price was. So that's not remotely the technology we're talking about here, and all of defendants' cases, which are all over 10 years old, all involve similar situations where the order was manually reviewed or manually routed, typically. Whereas there is a case, and defendants, again, have persisted in representing that no case has ever certified a class in these circumstances, and they are consistently wrong. New York Stock Exchange Specialist case by the Southern District of New York, 2009, after Newton, after every single one of defendants' authorities certified a class involving millions of data points, trading on the New York Stock Exchange, using almost the exact same computer algorithm. In fact, Dr. Corwin, our expert in this case, our second expert, was the expert in New York Stock Exchange Specialist, and he testified that the algorithm was accepted by the Southern District of New York in that case as adequately showing harm, and Dr. Corwin testified without rebuttal from defendants that this was the same algorithm. So once again, it is not an abuse of discretion for the district court to accept an algorithm for showing economic harm that had been accepted in the prior case, and not only in the civil case in that matter, but also by using the same algorithm used by the Department of Justice in the criminal prosecution in that case. So the suggestion that this algorithm is somehow incomplete or novel or uncertain is just incorrect. This is how the industry analyzes the execution of trades, and it does it on a daily basis using these exact same metrics, and they kick out these results, and where they're negative, whether that's IFQ or the other metric, which was a metric called Time Elapsed Opportunity Cost, or TIOC, they show harm. They show a failure of best execution. So first of all, they go to the merits, and secondly, the failure of best execution shows that those individual trades were harmed, and the attacks for that the algorithm was incomplete are really unfounded and were probably rejected by the district court, because defendants themselves prevented requests for, in discovery, for production of documents that would have an information that would have allowed Mr. Bodek and Dr. Corwin to generate a completed algorithm, but they expressly sought that to be limited. So for instance, the best evidence of the exceptions that are relevant to these trades is TD Ameritrade's own algorithm, which they refused to produce in discovery, and successfully obtained the limit so that we could not obtain that information in discovery. So for them now to turn around and complain that Mr. Bodek wasn't able to complete his model based just on Mr. Ford's data, we always said we wouldn't be able to complete the model based on just Mr. Ford's data. So defendants have accomplished what they set out to do, and they cannot now just turn around and say, well, you couldn't accomplish what you never said you could do. Here, so the real distinction, and the critical distinction in this case, why this model with submission should be accepted and can show harm, is the nature of, it's not just the nature of the technology that has changed between this case in Newton, for instance, and all the other cases, but it's also the theory of liability here. So the theory of liability in Newton was involving market orders that were executed at the MBBO, but could have been, under their theory, executed at a better price. And one of the key issues here that defendants have sometimes made, that some trades were received a better price through the MBBO, so they received what's called price improvement, and some received harmful trades, trade-throughs, and you're somehow entitled to net them off. That, as Dr. Corwin and Mr. Bodick explained, is completely improper, and that's not how it works. The customer is entitled to improvement in price, but the broker is never entitled to trade through the MBBO. So, the problem faced by the client, by the plaintiff in Newton, was that execution of a trade at MBBO doesn't necessarily show that best execution wasn't provided. It could be consistent with the duty of best execution, or it might not, depending on what other prices were available, once and again factoring into difference in technology and how orders are routed. When you have a trade-through, which is what we're identifying here, or an order that is not filled in violation of TARC, those show failure of best execution. And while there are exceptions, such as foreign securities or orders entered outside of trading hours, etc., those are all routine items that can be screened out. They're just a filter. And all that information is present in the trade data, the objective trade data that Mr. Bodek obtained from a vendor called Thesis, which gathers all the trade streams from every venue and market in the United States. And it combines all that into one ticker, essentially, and it contains all the information about, so you know when a stock is trading under unusual circumstances or security. We know, obviously, you know the time, so you can filter out executions outside of time. So, Mr. Bodek testified that he would be able, and Dr. Coleman agreed, that he would be able to modify the algorithm so that when you analyze the trading of every single TD Ameritrade customer, you will be able to identify, conservatively, by taking into account all these exceptions, orders that did not receive best execution. And that will be a list. And that will identify everyone. I mean, and so that will identify, and the negative value of IFQ and TIOC in those cases will also give you the measure of harm. So, under those circumstances, yes, of course, you have to go order by order because each individual customer submitted different orders. But that's also true, let's say, in every securities class action, or even every class action. You have to go, each individual class member has a different transaction. Consumer, you know, purchase, each one has an individual purchase of a product. Securities class action, each person buys a stock or sells a stock at a different time. So, but resolution of the issue of whether TD Ameritrade's algorithm violates the duty of best execution, with exception of Mr. Ford, will decide that issue for every single class member. The question of whether that was knowing will decide that for every single class member. Whether Mr. Ford is harmed through IFQ, through a negative IFQ or negative TEOC for some of its orders, and he suffered both, will decide that issue. That will establish that that is harm for every single class member, which can then be measured by application of the algorithm to all the trading data. How will you define the class if you say that you can determine that the algorithm violates the best execution duty for every class member? You're not saying the algorithm violates the duty as to every customer, right? Well, I think so. I'm sorry. I understand your point. It's not every customer who's deprived of the duty. You have to check to see whether they ended up with the right price or not. Am I understanding your theory? Not quite, Your Honor. The duty is a duty to seek the best execution. So the theory in our complaint is that the TD Ameritrade's algorithm violates the duty. They don't provide best execution to any of their customers. I see. So you really are arguing all the customers are deprived of their right to this duty because the algorithm wouldn't satisfy the duty, wouldn't seek. But what if a particular customer did end up getting the best price? Well, that is what they have. Yeah. Go ahead. Sorry, Your Honor. I didn't mean to interrupt. So arguably, therefore, every single trade using the TD Ameritrade routing program suffered harm because they paid a commission on every single one of those trades. And part of what you're paying your commission for is to receive best execution. And if you didn't get it, you're entitled to some or all of that commission back. I mean, there are lots of other issues that the lower court didn't have to address in its decision. But there are lots of remedies available here, Your Honor, including the commissions that were charged on orders, including some or all of them, including the profits that TD Ameritrade received as a result of selling the order flow and getting liquidity rebates, which was about $600 million during the course of the class period. All of the individual harm identified through IFQ and TEOP for individual trades seemed summed for individual customers. So all that menu of remedies is available here to the court. So what the algorithm identifies is that- Hold on a second. I didn't understand you to be arguing that every customer was a member of the class. That seems to be what you're saying now. I thought the algorithm was designed to sort out which customers were members and which ones were not. But you seem to be suggesting now every customer is injured by use of the algorithm and entitled to some kind of damages. Can you clear that up for us here before we- The class definition, I believe, is every customer of TD Ameritrade during the class period who had orders routed and who suffered harm thereby. So what the algorithm does- So we would submit and have consistently submitted that the TD Ameritrade algorithm does not seek best execution. So therefore, every order does not receive best execution. Now some may have accidentally received the same treatment they would have received if  they were in the class or not. So I would submit that they- I think, again, they're analogous to sort of in-and-out traders on a conventional 10 v. 5 case. So that yes, I think you would want them in the class in the sense that you would want their claims bound by the decision on whether the algorithm did, in fact, violate best execution and whether that was intentional. Now they may not have any recoverable damages, but I think that's a calculation of damages issues, not whether they were harmed. I think they have standing for that. I think they have harm to their private right because they've not received best execution. We get into- You have to get into a sometimes a not so very clear analysis as to between harm and measurable damages and the extent to which damages are recoverable in this instance. So- Well, typically, if you don't have any harm or damage- If you don't have any damage, you don't have any harm. You seem to be hypothesizing somebody who's been harmed without any injury or tangible injury. Well, I think Colton Newton described the fact that when you have this breach of a duty of best execution, then the breach and the harm, harm is almost implied as a result of the breach because your agent has not complied with that duty that we owe to you. So- I think Mr. Pryor has had a question for you. Oh, okay. Well, I was going to say, I think the key phrase there was your statement, and suffered harm thereby. It's still not clear to me why this is not a feel-safe class. Well, your honor, I would- The words- I don't think those words- I mean, because if the polymath- Polymaths sometimes have, and why those words were included in the definition is that if you don't include them, then you get attacked by saying, well, you're including people who haven't suffered harm in the class. So I don't want to get involved. I think it's, to some degree, a question of semantics. I mean, the idea that this is not an ascertainable class where the class is bound- limited to people who already have a contractual relationship with TD Ameritrade. I mean, the only people who are members of the class, the largest extent of the class are all customers of TD Ameritrade, who have a contract with TD Ameritrade. TD Ameritrade knows exactly who they are. So the question is whether you have, in every case, some members of the class who don't suffer loss. As I said, one example would be in a classic 10 to 5 stock drop cases, people who buy the shares at an artificially inflated price have suffered harm because they purchased an inflated harm. But if they're able to sell the stock before that harm is revealed and the price drops as a result, they have suffered no recoverable damages. They are still included in the class, and their claims are bound by any release in a settlement or bound by any jury verdict. So I would view that as analogous here, which is you can ascertain the damages and ascertain who is harmed here, and you can send a notice out, as long as it's impractical to send out a notice because you don't know who to send it to. I mean, you can send it out to all the customers at the time. So I don't see, to the extent ascertainability is a requirement, I don't think that is breached here. I don't think it's a failsafe class, to the extent that any class obviously only includes people who suffer loss and can recover. So with respect, I don't think, this is different from the sort of class failsafe issues that this court addressed in Orduno. I mean, this is just a very different, I mean, the whole level of proof and circumstance in this case, I think it's just very different. I don't think that case is particularly informative here. All right. Unless there are other questions, we thank you for your argument. Thank you for letting me go over time, Your Honor. Yes. We'll hear from Mr. Hockman in rebuttal. Thank you, Judge Collin. I appreciate that. Sorry about that. I want to pick up right where you went, Judge Collin, because I think you got to the nub of the issue. You have to distinguish between the duty at issue here, which is not to misrepresent that you are going to seek best execution. That's what SEC and DOJ algorithms do. That's what regulators do. That's what regular and rigorous review is about. We discuss all that in our brief, and we said for class certification purposes, just push that aside. And the question of whether there was economic loss, and make no mistake, no matter what, no matter how many times Mr. Hockman says, well, it's semantic, that is a substantive element of liability in a 10b-5 claim. You cannot semantically wish it away. You cannot pretend that breach of the duty is necessarily the presence of economic loss, of harm. It isn't. And there are specific instances of that discussed in all of the back and forth between Clyden and Bodek over the course of the case that caused Clyden to change his algorithm all the time. So that distinction, and we're focused here on economic loss. He cannot, and he never did, get to the point where he said, I can by common proof establish economic loss. In fact, he said the opposite. He said, it was always said we can't complete the algorithm with just Ford's data. That's what he said. We always said we can't complete the algorithm with just Ford's data. In other words, we can't know whether any other class member suffered economic loss without Ford's, just with Ford's data. Ford is not determining, the outcome of Ford's case is not determining other claims. Judge Blender? What's your response to the argument that your efforts to limit discovery have resulted in the algorithm not being finalized? Here's why we limited discovery. Because this was about class certification. This was class discovery. And class discovery is supposed to be based on the named plaintiff. Can you prove the named plaintiff's claim? If you can prove the named plaintiff's claim, then you can show me why the named plaintiff is representative of the class, and if you can do that, you get the class. You get to have a class action. But what they did is they took all the named plaintiff's information, and then they said, we can't use the named plaintiff as a representative of the class with respect to economic loss, an element of liability in this case. That's just critical. That's why we were right to limit discovery. And that's why having limited discovery, their admission that they can't do it is an admission that this is not a proper class case. I want to turn... If TD Ameritrade used the algorithm to execute Ford's trades, why wasn't it proper discovery? Because that would be a discovery related only to duty, to whether we breached our duty to seek best execution, which as I said, we said for class certification purposes, we're not disputing. We'll get to the merits on that. We'll get to the merits, but this was class discovery. And so the algorithm that we use could only be used to answer the question whether we didn't in fact seek best execution. We think we did, but that's a dispute for later. That's not the class certification dispute that we teed up, which was economic loss. You're not going to be able to show economic loss, even if you assume a breach of the duty in some aggregate sense, which is exactly how the SEC and DOJ and FINRA and regular and rigorous review analyzes it, none of those regulators do what BODEC proposes to be doing. Nobody reconstructs the market. Nobody goes trade by trade by trade, order by order by order and says, best execution here with economic loss, not best execution here with no economic loss, et cetera, et cetera. Nobody does that. And so BODEC is really doing something completely different, and we were proper to limit this because this was our class certification argument, and we were entitled to make it and not have to run all the way through massive merits discovery in the process. I see I'm over time, but Judge Collin, I do want to address the ascertainability question about this court's cases. Just quickly, in Sandusky at page 996, Sandusky and Wellness, the court does say that the requirement, but it has said that it is elementary, that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable. It's just not well developed. What I was thinking from Morduno was the passage where you said, a failsafe class is also unmanageable because the court cannot know to whom notice should be sent. I'm treating that as if we were careful there because manageability is a term in the rule. Right. In fairness, I apologize for that. It's therefore more controversial as to whether it's really the right focus. I see it as substantively the same thing. You don't know who's in and who's out, and that's fundamentally the problem. You need to know who's in in order to know who to send class notice to. It could be substantively the same, it's just that Morduno ties it more to the language of the rule perhaps. Fair. Fair. All right. Is that the point you wanted to make? That was the point I wanted to make about it. All right. Well, we appreciate the argument from both counsel. The case is submitted and the court will file an opinion in due course. Thank you both for being this way.